IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-00068-MSK-MJW

JAMES H. MASON, D.D.S.,
JAMES H. MASON, D.D.S., P.C., and
JAMES H. MASON, D.D.S., PLLC,

      Plaintiffs,

v.

ORTHODONTIC CENTERS OF COLORADO, INC., a Delaware corporation,
ORTHODONTIC CENTERS OF GEORGIA, INC., a Delaware corporation, and
ORTHODONTIC CENTERS OF AMERICA, INC., a Delaware corporation,

      Defendants.

---

**OPINION AND ORDER REOPENING CASE AND GRANTING MOTION FOR
SUMMARY JUDGMENT**

---

      **THIS MATTER** comes before the Court pursuant to the Plaintiffs' Motions to Reopen

the Case **(# 41)**; and the Plaintiffs' Motion for Summary Judgment **(# 42)**, the Defendants'

response **(# 52)**, and the Plaintiffs' reply **(# 53)**.

## FACTS

      According to the Amended Complaint **(# 3)**, the Plaintiffs are an individual dentist and

corporate organizations by which he practices dentistry in both Colorado and Georgia.   In 1999,

the Plaintiffs and Defendants entered into an agreement ("the Agreement"), under which the

Defendants would supply various dental office management services – *e.g.* hiring and managing

staff; leasing office space and equipment; providing bookkeeping, collections, and other

1

administrative services, etc. – to the Plaintiffs in exchange for a percentage of the office's profits. (The precise details of the agreement between the Plaintiff and Defendants for such services will be discussed more fully within the analysis below.)

Eventually, a dispute between the parties arose as to the Agreement, and this litigation followed.  The Amended Complaint alleges nine claims for relief: (i) a request for a declaration that the parties' contractual agreement for the business services is void as violative of Colorado public policy governing the unlicensed practice of dentistry; (ii) a request for a declaration that the agreement is void due to fraudulent inducement; (iii) a request for a declaration that the agreement's non-competition clause is invalid; (iv) breach of contract is various respects; (v) negligence (many of the acts alleged to be breaches of the contract are also alleged to be acts of negligence); (vi) negligent misrepresentation, arising from similar conduct alleged in the negligence and breach of contract claims; (vii) fraud; (viii) violation of the Colorado Consumer Protection Act; and (ix) breach of fiduciary duty.

Shortly after this case was commenced, the Defendants filed a Chapter 11 petition in Bankruptcy Court.  The parties initially agreed to close this case pending the resolution of the bankruptcy proceedings.  The Plaintiffs moved before the Bankruptcy Court for relief from the automatic stay for the sole purpose of seeking summary judgment on the first claim for relief – the request for a declaration that the agreement is void as against public policy.  Having obtained such relief, the Plaintiffs now move to reopen the case **(# 41)** to address that issue and, separately, for summary judgment **(# 42)** declaring the agreement void.

## ANALYSIS

### A.  Reopening of case

The Plaintiffs contend that there is now good cause to reopen the action, having obtained relief from the automatic stay in bankruptcy to address the issue of whether the Agreement is void.  The Defendants do not oppose the request to reopen the case.  The Court finds that there are good grounds to reopen the case, and the motion is granted.

### B.  Summary judgment

#### 1.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When, as here, the movant has the burden of proof at trial on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

### 2.  Terms of the Agreement

The operative facts do not appear to be genuinely in dispute. The parties agree that they entered in the Agreement, and do not appear to dispute its terms.

The Plaintiffs and the Defendants entered into the agreement on July 1, 1999, regarding dental offices operated by Plaintiff James Mason in Georgia. In 2001, Plaintiff James Mason relocated his practice to Colorado, and in March 2001, the parties agreed to amend the Agreement to apply to the Colorado offices as well.

Section 1.1 of the Agreement provides that the Defendants shall provide "business and administrative support and services" needed for the "day-to-day operations" of the Plaintiffs' practice. Specifically, those services include "employment, scheduling and training" of office staff; "provision and maintenance of the 'offices,' telephones and utilities"; the supplying of fixtures, furniture, and equipment; bookkeeping and accounting services; billing and collection services; and various other matters. Section 1.2 of the Agreement expressly states that the

4

parties agree that the Agreement does not constitute the practice of dentistry in the State of Georgia, and further agree that any provision found to constitute such practice of dentistry will be severed from the Agreement.  Section 1.4 provides that the Defendants shall lease to the Plaintiffs all of the furniture and equipment they require.  Section 1.5 provides that the Defendants shall obtain and sublease offices to the Plaintiffs, consistent with the Plaintiffs' needs and approval.

The Agreement's financial terms are found in Article III.  Section 3.1 provides that the Plaintiffs shall pay a monthly services fee, calculated according to a formula set forth in Exhibit B to the Agreement.  That formula calculates the total value of services provided by the Plaintiffs each month, the actual payments received for such services, and the Plaintiffs' operating expenses, then sets the monthly fee as: (value of services) - (.6 x (payments received - operating expenses)).  Although an oversimplification, the monthly fee payable to the Defendants is essentially 40% of the Plaintiffs' monthly receipts, plus reimbursement of operating expenses incurred by the Defendants.

Section 8.5 of the Agreement provides that its validity, interpretation, and performance will be governed by the laws of the State of Georgia, without regard to that state's principles of conflicts of law.

3.   <u>Governing law</u>

The Defendants contend that, because the Agreement states that it is to be governed according to Georgia law, the Court should only consider whether the terms of the Agreement result in the Defendants illegally practicing dentistry as defined by the laws of Georgia.  There is some merit to this argument, at least with regard to some of the parties here.  The Amended Complaint states that Plaintiff James H. Mason, D.D.S., P.C. is a Georgia corporation, through

5

which Plaintiff James H. Mason engages (or perhaps engaged, the Amended Complaint is not clear) in the practice of dentistry in Georgia.  To the extent that the Plaintiffs engage in dentistry in Georgia, it is logical that Georgia law would apply to all aspects of this case.

However, as relevant here, the choice of law provision of the contract is immaterial.  The Defendants are correct that, to the extent the Court is required to apply the substantive law of contracts, it would be appropriate to apply Georgia law to determine, for example, whether the parties entered into a binding agreement, or how an ambiguous term of the Agreement should be construed.  However, nothing in this case requires the application of substantive contract law, as neither party contests that a binding contract exists or disputes the meaning of its terms.  The question presented here is whether one or more of those unambiguous terms are contrary to the public policies of the State of Colorado, thereby preventing enforcement of the Agreement in this state.  There can be no colorable argument that the determination of Colorado's public policies must be made in light of Georgia law, and thus, the Court rejects any argument by the Defendants that the choice of law provision in the Agreement is relevant here.[1]

### 4. Validity of the Agreement under Colorado public policy

The Plaintiffs raise several arguments as to how the Agreement violates Colorado's public policy: (i) that the Agreement is similar to those found to be prohibited by the Colorado courts in the early 20th century, *citing People v. Painless Parker Dentist*, 275 P. 928 (Colo. 1929) *and State Board of Dental Examiners v. Miller*, 8 P.2d 699 (Colo. 1932); (ii) that the Agreement

---

[1] The Court assumes, and will limit its analysis to, that the parties' arguments relate only to the Plaintiffs' operations located in Colorado.  The parties have not addressed, and the Court renders no opinion as to, whether any practice the Plaintiffs maintain in Georgia is affected by this ruling.

constitutes fee sharing, prohibited by C.R.S. § 12-35-129(1)(v); (iii) the Agreement allows the

Defendants to become "proprietors" of a dental practice in violation of C.R.S. § 12-25-113(1)(b);

(iv) the Agreement constitutes an illegal financial interest in a professional corporation under

C.R.S. § 12-35-116(1).

The Court puts aside the Plaintiffs' arguments with regard to historical findings of the

Colorado Supreme Court, as those findings pose only an academic relevance[2] now that the

Colorado legislature has statutorily codified its rules against the unauthorized practice of

dentistry. Instead, the Court focuses its analysis on the Plaintiffs' arguments that the Agreement

violates public policies as embodied in current statutory law.

   a.. Fee-sharing

C.R.S. § 12-35-129(1)(v) provides that the Board of Dental Examiners can take

disciplinary action against a dentist who, among other things, "shar[es] any professional fees with

anyone except those with whom the dentist . . . is lawfully associated in the practice of dentistry."

The Plaintiffs argue that the Agreement constitutes an illegal sharing of fees because the "monthly

services fee" is derived directly from the profits of the Plaintiffs' practice.  The Defendants

respond that: (i) the Agreement does not constitute improper fee sharing because the statute only

prohibits sharing of referral fees; (ii) that the fees payable under the Agreement are for marketing

services as permitted by law; and (iii) even if the Agreement does constitute improper fee sharing,

the fact that the Plaintiffs can be professionally disciplined does not require that the contract itself

be voided.

---

[2]The Court briefly addresses below the historical relevance of one of these cases as it relates to one of the Defendants' arguments.

Turning to the first argument, the Defendants contend first that dictionary definitions of "fee sharing" or "fee splitting" refer only to prohibiting "sharing a professional fee with a referring party." *Citing Black's Law Dictionary*, 8th ed.  The Defendant goes on to argue that an earlier version of the statute prohibited "[s]haring professional fees with anyone or paying any person for sending or referring patients," and that the legislature later omitted the second clause as "redundant" because fee sharing necessarily entails "paying any person for sending or referring patients."  They argue that because the Agreement does not entail payments from the Plaintiffs based on referrals of patients, the financial arrangement between the parties does not constitute fee splitting.

The Court finds this argument without merit.  The Defendants do not cite to any authority for the proposition that the change in the statutory text was made because the legislature necessarily equated or limited "fee sharing" solely to the practice of making referral payments, nor do the Defendants offer any logical explanation why, if the legislature indeed perceived a redundancy, it chose to omit the pinpoint-specific definition of the prohibited act in favor of a more general description readily susceptible to overinterpretation.  The Court has some doubt as to whether definitions from legal or general dictionaries are useful aids to interpreting a statute's terms, especially when the legal definition addresses its application to the context of the practice of law, not dentistry.  Assuming some application, however, the Defendants have inexplicably truncated the definition of "fee splitting" from Black's Law Dictionary, which defines the term as not only a lawyer paying for client referrals, but also "[t]he division of attorney's fees between two or more lawyers who represent a client jointly but are not in the same firm." This latter definition bears some resemblance to the facts here, as the Agreement contemplates the division of client

payments for dental services between two distinct legal entities who are jointly engaged in supplying (or facilitating the supplying) of those services.

More importantly, however, is that the Defendants' argument is appears nonsensical. Interpreting the Colorado statute to prohibit <u>only</u> referral-based fee sharing would permit innumerable instance of clearly prohibited fee-sharing.  For example, under the Defendants' interpretation of the statute, a dentist would be free to overtly enter into an agreement to share patient fees with his or her landlord, auto mechanic, or barber, so long as the sharing was not based on patient referrals.  This is clearly not the object of the statute.

The Defendants' second argument seeks to exploit an exception in C.R.S. § 12-35-129(1)(v) that permits fee sharing if a dentist "pays to an independent advertising or marketing agent compensation for advertising or marketing services."  The Defendants argue that, among the 14 categories of obligations listed in Section 1.1 of the Agreement is the duty of the Defendants to provide "consulting advice on Practice efficiency and productivity, marketing, Office locations and layouts, and staff salaries [etc.] as requested."  The Defendants suggest that this single reference to "marketing" allows it to "easily fit[ ] within" the marketing exception in the statute.

This argument, too, is without merit.  Even assuming that the "marketing" services contemplated by the Agreement are the type contemplated by the marketing exception in the statute, the statutory exception applies only to payments that are made "for advertising or marketing services."  Thus, that portion of the Plaintiff's monthly service fees that might be attributable to marketing efforts by the Defendants might be exempt from the prohibition on fee splitting, but to the extent that payment is attributable to any one of the other 13 categories of

services provided by the Defendants, the marketing exception provides the Defendants no solace. The marketing services the Defendants provide are a relatively small component of the overall package for which they are compensated, particularly compared to such services as office rent and equipment leasing. Thus, even if some portion of the Plaintiffs' fees are devoted to advertising, the bulk of the monthly service fee is impermissible fee sharing.

The Defendants' final argument asserts that, if they are indeed engaged in prohibited fee sharing, such fact, alone does not render the Agreement void as against public policy. The Defendants contend that the only legislative sanction contemplated by C.R.S. § 12-35-129(1)(v) is disciplinary action against the dentist involved, and that if the legislature had intended to go further and nullify contracts involving fee sharing, it could have done so.

It is a long-standing axiom of contract law that a contractual provision is void if the interest in enforcing the provision is clearly outweighed by a contrary public policy. *FDIC v. American Cas. Co.*, 843 P.2d 1285, 1290 (Colo. 1992), *citing Restatement (Second),* Contracts, § 178. Whether the parties entered into the contract in good faith, and whether they performed the contract according to its terms are irrelevant to the inquiry. *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 108-09 (Colo. 1992). The rule exists not to protect the party seeking to avoid its obligations under the agreement, but rather, for the protection of the public at large. *Pierce v. St. Vrain Valley School Dist.*, 944 P.2d 646, 649 (Colo. App. 1997), *rev'd on other grounds*, 981 P.2d 600 (Colo. 1999).

The Colorado legislature has, at times, expressly stated that contracts contravening particular legislative enactments are deemed void. *See e.g. Ingold v. AIMCO/Bluffs, LLC*, 159 P.3d 116, 123 (Colo. 2007), *citing* C.R.S. § 38-12-103(7) (voiding contractual waivers of rights

under Security Deposits Act) *and* C.R.S. § 8-4-125 (voiding waivers of rights under Wage Claim

Act). However, the Court's ability to void a contract on public policy grounds does not depend

upon the legislature expressly providing for it. Section 178(1) of the Restatement of Contracts,

cited with approval by the Colorado Supreme Court in *American Casualty, supra*, explains that

an expressed legislative intent to nullify such agreements is only one of two alternative ways in

which a contract can be rendered void. That section states, "[a] promise or other term of an

agreement is unenforceable on grounds of public policy if legislation provides that it is

unenforceable <u>or</u> the interest in its enforcement is clearly outweighed in the circumstances by a

public policy against the enforcement of such terms."[3] *Restatement, supra* (emphasis added).

Commentary to this section states that "Only infrequently does legislation, on grounds of public

policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually

does so . . . although [the legislature] says nothing explicitly about unenforceability." *Id.*,

comment b. Where the legislature does not expressly provide for invalidity of contrary

contractual provisions, the Court must weigh the legitimate interests of the parties against the

weight of the policy and its connection with the parties' conduct. *Id.*, § 178(2), (3); *Norton*

*Frickey, PC v. James B. Turner, PC*, 94 P.3d 1266, 1267 (Colo. App. 2004) ("a contract

provision is void if the interest in enforcing the provision is clearly outweighed by a contrary

public policy").

   The Defendants cite to *Irwin v. Curie*, 64 N.E. 161 (N.Y. 1902) and *Northern Indiana*

*Public Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986), as well as

---

[3]The Court notes that, as with their quotation from *Black's Law Dictionary*, the Defendants' quotation from this section of the Restatement deliberately omits the second, more relevant, portion of the text.

Section 179 of the Restatement, for the proposition that the legislature's decision to expose fee-sharing dentists to professional discipline constitutes the exclusive remedy for such a violation, preventing the voiding of a fee-sharing contract.  Turning first to the Restatement, Section 179 provides that the existence of a public policy favoring the voiding of an agreement can be derived from legislation itself, or from judicially-recognized needs to protect public welfare.  The Defendants quote a portion of comment b to this section, to the effect that "civil sanctions . . . may suggest that no other sanction such as unenforceability is intended."  The actual text of comment b is far more equivocal:

> When proscribing conduct, however, legislators seldom address themselves explicitly to the problems of contract law that may arise in connection with such conduct.  Usually they do not even have these problems in mind and say nothing as to the enforceability of terms. In such situations it is pointless to search for the "intention of the legislature," and the court's task is to determine on its own whether it should, by refusing to enforce the promise, add a sanction to those already provided by the legislature. . . The legislation is significant, not as controlling the disposition of the case, but as enlightening the court concerning some specific policy to which it is relevant. A court will examine the particular statute in the light of the whole legislative scheme in the jurisdiction to see, for example, if similar statutes in the same area contain explicit provisions making comparable promises unenforceable. It will look to the purpose and history of the statute. The fact that the statute explicitly prohibits the making of a promise or the engaging in the promised conduct may be persuasive in showing a policy against enforcement of a promise but it is not necessarily conclusive. On the other hand, the fact that the statute provides a civil sanction, whether in addition to a criminal penalty or not, may suggest that no other civil sanction such as unenforceability is intended, but this is not necessarily conclusive either.

*Restatement (Second),* Contracts, § 179, comment b.  Far from suggesting that the existence of a disciplinary penalty for fee sharing operates as an exclusive remedy, thereby prohibiting

nullification of a fee-sharing agreement, this language suggests that the professional penalty is but a single, possibly inconclusive factor to be weighed among many others.

In *Irwin*, the court considered a case in which the defendant lawyer had engaged in a form of champerty, agreeing to acquire a one-half interest in the plaintiff's claims. The New York State Court of Appeals found that the attorney's actions constituted a criminal misdemeanor under New York law, but refused the attorney's request to deem the underlying agreement void as against public policy. The Defendants here correctly point out that the *Irwin* court was persuaded by the fact that the law prohibiting champerty expressly provided for a sanction only against the attorney, but this Court finds *Irwin* to be unconvincing in light of modern law. The crux of the court's decision was not simply the fact that the statutes did not contemplate a sanction against the non-attorney plaintiff. Rather, because the statutes provided for punishment against only one of the contracting parties, the court found that "the parties are not equally guilty; . . . whenever the statute imposes a penalty upon one party, and none on the other, they are not to be regarded as par delitcum." *Id.* at 162. Because the court deemed the defendant to be more culpable than the plaintiff, it concluded that the defendant "cannot invoke his violation of law for the purpose of retaining moneys which he agreed plaintiff should have, and but for which agreement would not have come into defendant's possession." *Id.* *Irwin*'s focus on whether the parties were of comparable culpability – whether they were "in pari delicto," *id.* at 161, 162 – is contrary to the modern understanding of the doctrine of voidness as against public policy. As discussed above, the modern view does not inquire as to whether the contracting parties acted in good or bad faith, or concern itself with whether one is using the doctrine to obtain a strategic advantage against the other. *Lorenz*, 823 P.2d at 108-09. Indeed, in its analysis, the Court pays

13

little concern to the contracting parties at all; the Court is exclusively concerned with whether nullification of the contract is necessary to protect the <u>public</u>.  *Compare Pierce*, 944 P.2d at 649. By contrast, *Irwin*'s focus is solely on the relative equities <u>as between the parties</u>, and the court there made no effort to examine the public interests that would or would not be served by enforcing the parties' agreement.  Thus, *Irwin* is less a case applying the modern doctrine of voidness based on public policy grounds, and more of an equitable case that merely seeks to do justice as between the two adverse parties.

*Northern Indiana*, on the other hand, appears to hew quite closely to Section 178 of the Restatement.  There, a utility agreed to buy a fixed amount of coal from the defendant at designated prices.  When the utility found it could buy electricity more cheaply than it could generate it, it ceased buying coal under the agreement and sued to declare the contract void under federal law.  The court explained that although there are statutory remedies that might exist to nullify the contract, the question presented was whether the court should judicially impose a voidness remedy.  "To decide whether" voiding the agreement was appropriate, it explained, "we must consider the reciprocal dangers of overdeterrence and underdeterrence," namely, balancing the benefits of "creating stability in contract relations and preserving reasonable expectations" of the parties against the deterrent value of "refusing to let the violator [of public policy] enforce the contract."  799 F.2d at 273.  This balancing of the interests of the contracting parties against the public interest is precisely the approach counseled by Section 178 of the Restatement.  Thus, if anything, *Northern Indiana* stands for the proposition that the existence of a statutory remedy does not relieve the Court of the need to engage in Section 178's balancing of public and private interests.

14

Because Colorado's Supreme Court has cited Section 178 of the Restatement with approval, and no other Colorado caselaw presents a comprehensive analytical framework for deciding when to impose the judicially-created remedy of voidness as against public policy, the Court will engage in the analysis counseled by the Restatement.  In conducting Section 178's balancing, the Court considers the following factors: (i) the parties' justified expectations; (ii) any forfeiture that would result if enforcement were denied; (iii) any special public interest in the enforcement of a particular term; (iv) the strength of the public policy at issue; (v) the likelihood that refusal to enforce the agreement will further that interest; (vi) the seriousness of the misconduct involved and its wilfulness; and (vii) the directness of the connection between the misconduct and the agreement.  *Restatement (Second)*, Contracts, § 178(2), (3).  In addition, Section 179 of the Restatement describes further factors that warrant some consideration, including the existence of similar statutory regulations in other contexts that provide for voiding unlawful agreements, and the penalties expressly provided for by the legislature.  *Id.*, § 179, comment b.

There can be little doubt that the Defendants had some justifiable expectation that the Agreement would be enforceable, and indeed, the parties have treated it as such and performed according to its terms for several years.  There is some reason to question whether the Defendants had complete confidence in the enforceability of the Agreement as written, as the Agreement contains several disclaimers seeking to avoid any construction that would suggest that the Defendants are engaged in the practice of dentistry, and provides for severability should that occur.  But, in general, the Court finds that the parties legitimately expected that the Agreement

15

would be performed according to its terms, and finds that this factor weighs substantially in favor of enforcement.

The second factor, the degree of forfeiture that would result if the contract were voided is not nearly as favorable to the Defendants.  Although voiding of the contract would deprive the Defendants of compensation according to the Agreement's formula, there is no apparent reason why the Defendants could not pursue an equitable claim for unjust enrichment as to the reasonable value of the services it has provided to the Plaintiffs for which it has not received payment.  Although Colorado courts have refused to invoke equitable doctrines to substitute for enforcement of an agreement that is void as against public policy, it is clear that this limitation only applies to prevent a <u>wrongdoer</u> from recovery.  *See Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo. App. 2002).  Assuming that the Defendants can show that their own conduct was proper[4], there appears to be no reason why they could not recover the fair value of the services they have already provided to the Plaintiffs.[5]  Thus, this factor tips significantly in favor of voiding the contract.

The Court can discern no specific public policies that would be advanced by enforcing the contract, other than the general policies reinforcing the stability of contract law.  Thus, it turns to the strength of the public policy at issue here.  Colorado has long regulated the conduct of

---

[4]Indeed, with respect to the fee-splitting aspect, it is not the provision of services under the Agreement that violates Colorado's public policy; it is the Agreement's means of computing payment for such services.

[5]Obviously, the Defendants cannot force the Plaintiffs to continue to perform a contract that requires them to violate state law, and thus, the Defendants would not enjoy the future revenues contemplated by the Agreement.  The Court does not opine as to whether the Defendants could state a equitable claim that would allow them to recover for these expected future profits.

dentists, and has continuously maintained statutory prohibitions against fee sharing since 1935.

1935 C.S.A Ch. 52, § 12(11).  Although the Colorado courts have never directly discussed the

rationale behind rules prohibiting fee-splitting, several justifications for the ban are evident,

including the need for dentists to avoid financial conflicts of interest, the need for informed

consent by the patient, and the necessity of avoiding non-professional interference in professional

decisionmaking.[6]  The importance of the prohibition is underscored by the penalties available for a

violation of C.R.S. §12-35-129, which include a range of potential sanctions, up to and including

suspension or revocation of a dentist's license.  Although these penalties apply to a range of

unprofessional conduct that includes fee-splitting as one of many prohibited practices, there can

be no dispute that Colorado views fee splitting by dentists as a disciplinary infraction that could

result in severe penalties.  On the whole, the Court finds that the importance of the public policy

weighs strongly against enforcing the Agreement.

The final three factors generally examine the closeness of the connection between the

pubic policy and the nature of the Agreement.  Here, the Agreement's formula clearly calculates

the fees payable to the Defendants as a direct percentage of fees paid for dental services.  This is

undoubtedly a form of fee splitting that violates the statute.  Thus, voiding the Agreement would

directly further the public policy of prohibiting fee splitting.  By contrast, allowing the Defendants

to nevertheless enforce the Agreement would effectively condone that which the Colorado

legislature has sought to prohibit.  The record does not reflect the extent to which the Plaintiffs'

decision to enter into an Agreement that provided for prohibited fee sharing was knowing or

---

[6]As the Plaintiffs' motion points out, Colorado prohibits fee-splitting to one extent or
another in many of the professions it regulates.

17

intentional, but the Court finds that, even if it were to assume that the Plaintiffs were fully aware that the Agreement was violative of the regulations, and did so with the intention of later disclaiming its effect, this factor adds little weight. As the Colorado courts make clear, the good or bad faith of the contracting parties is not of significance in deciding whether the public interest requires a contract to be voided.

Finally, the Court considers those additional factors discussed in comment b to Section 179 of the Restatement. As noted above, Colorado prohibits fee splitting in many of its regulated professions, but none of those regulatory schemes address the question of whether an agreement for professional services that impermissibly splits fees is voidable. The fact that the statute only proposes discipline for the dentist agreeing to split the fees is not persuasive evidence that the legislature intended such agreements to be enforceable against the dentist. Logically, the Defendants cannot seek to enforce the Agreement into the future, as doing so would force the Plaintiffs to continuously violate state law. If the Agreement can be voided prospectively on public policy grounds, there is little logic in finding that the same public policies do not permit it to be voided retrospectively as well. Once again, any unfairness to the Defendants that results from voiding the Agreement in its entirety is largely mitigated by the available remedy of a claim for unjust enrichment.

Accordingly, upon full consideration of all the relevant factors, the Court finds that the public interest prohibiting fee splitting, as expressed in C.R.S. § 12-35-129(1)(v), outweighs any private interests the Defendants might have in enforcing the payment term of the Agreement. The public interest is a strong one, and the conduct contemplated by the Agreement directly contravenes the purposes that the public policy advances. Although voiding the contract works

18

some degree of inequity upon the Defendants, they are not unreasonably prejudiced, as the law likely permits them to recover the reasonable value of the services they have provided to the Plaintiffs.  Thus, the Court finds that the portion of the agreement that permits fee splitting – namely, Exhibit B's formula for calculating the monthly service fee – is void as against public policy.

### b.  Maintenance of a dental proprietorship

C.R.S. § 12-35-113(1)(b) provides that a person who "is a proprietor of a place where dental . . . services are performed" is engaged in the practice of dentistry.  As relevant here, C.R.S. § 12-35-103(14)(b) defines a "proprietor" as a person who "places in possession of a dentist . . . such dental material or equipment as may be necessary for the management of a dental office on the basis of a lease or any other agreement for compensation for the use of such material, equipment, or offices."   Similarly, a proprietor is also one who "retains the ownership or control of dental equipment or material or a dental office and makes the same available in any manner for use by dentists."[7]  C.R.S. § 12-35-103(14)(c).

There can be little dispute that, under the statutory definition, the Defendants are engaged in the practice of dentistry as "proprietors" of a dental office.  Section 1.4 of the Agreement requires that "[the Defendants] shall acquire . . . equipment reasonably required for the operation of the Practice," and then "lease[ ] to the Orthodontist" such equipment.  The Agreement expressly provides that "Ownership of the . . . Equipment shall remain, as between the parties hereto, exclusively in [the Defendants] at all times during the term hereof."  The Defendants'

---

[7]The statute exempts a seller's retention of ownership in dental equipment in the form of a chattel mortgage, but there is no suggestion in the parties' Agreement that that exemption would be applicable here.

ownership of the equipment and agreement to lease it to the Plaintiffs clearly constitutes

"plac[ing] in possession of a dentist . . . [dental] equipment . . . on the basis of a lease," and thus

renders the Defendants "proprietors" of a dental operation under C.R.S. § 12-35-103(14)(b).

Likewise, it is undisputed that the Defendants "retain[ ] the ownership" of dental equipment

provided to the Plaintiffs, thus rendering them proprietors of a dental practice under C.R.S. § 12-

35-103(14)(c) as well.   This, in turn establishes that the Defendants are engaging in the practice

of dentistry under C.R.S. §12-35-113(1)(b), and because they lack a license to engage in such

practice, the Defendants are in violation of C.R.S. § 12-35-112(1)(a).

Likewise, Section 1.5 of the Agreement provides that the Defendants "shall lease or

otherwise arrange for the officers and premises" of the Defendants' practice, and "hereby

subleases the Offices to [the Plaintiffs]."  This too renders the Defendants "proprietors" of a

dental practice, as the Defendants "Retain[ ] the ownership or control of . . . a dental office and

makes the same available" for use by the Plaintiffs.  C.R.S. § 12-35-103(14)(c).

The Defendants do not dispute that they constitute "proprietors" as that term is defined in

the statute, but argue that not every "proprietor" is necessarily engaged in the practice of dentistry

under the statute.  They contend that "what Section 113 actually forbids is being 'the proprietor

of a place' where dental equipment and material is placed in the hands of dentists."  (Emphasis in

original.)  The Defendants go on to argue, somewhat confusingly, that the meaning of the term

"place" in C.R.S. § 12-35-113 must be considered in conjunction with the rationale of *Miller*.  In

*Miller*, the Colorado Supreme Court considered the Board of Dental Examiners' revocation of

dental licenses of three dentists who had affiliated themselves with the Parker Dental System

Company, an unlicensed entity that purported to offer participating dentists the benefit of the

company's "system" of specific dental techniques, office management services, leasing of office space and equipment, and general management of most aspects of a dental office. 8 P.2d at 700. Finding that the "system" amounted to nothing more than "elaborate methods ingeniously employment by the system company to practice dentistry by proxy," the court upheld the license revocations. *Id.* at 702.

To the extent that *Miller* helps clarify the meaning of the phrase "proprietor of a place where dental . . . services are performed," such clarification is not helpful to the Defendants. Indeed, in many material respects, the services provided by the Defendants are identical to those offered by the company in *Miller* – in both cases, the corporate entity owns or controls both the physical location of the dental offices and the dental equipment to be used therein, and leases that space and equipment to the dentists themselves. The Defendants emphasize that, unlike the company in *Miller*, they do not prescribe or control the particular dental techniques that the Plaintiffs perform. Although this is a valid distinction between the facts of *Miller* and the instant case, it has no apparent bearing on the issue of whether the Defendants are "practicing dentistry" as a result of being "proprietors" of a dental office. The statutory definition of a "proprietor" is not susceptible to an interpretation that turns on whether the alleged proprietor controls the nature of the dental services performed; rather, it is focused only on the alleged proprietor's ownership of the premises and equipment used in the dental practice.[8]

---

[8]The Defendants appear to believe that Section 103's use of the phrase "management of a dental office" is intended to encompass only the type of "management" that the corporation in *Miller* engaged in, which included dictating the particular dental techniques that would be used. The Court finds nothing in *Miller*, the statute, nor any other source that would suggest that the legislature had such an unusual conception of the commonly-understood term "management" when it wrote the statute.

In any event, even if the Court were to accept the Defendants' argument that, to practice dentistry as a proprietor, one must also control the place in which equipment is delivered to a dentist, it is clear that the Agreement empowers the Defendants to do so.  The Agreement makes clear that the Defendants hold the primary lease on the actual physical space where the Plaintiffs' practice – and the Defendants' equipment – is located.  Thus, the Defendants are the proprietors – *i.e.* they "retain the ownership or control"of the physical premises (and all of the equipment therein) – of a "place where dental . . . services are performed."[9]

Accordingly, the Court finds that Sections 1.4 and 1.5 of the Agreement cause the Defendants to be engaged in the practice of dentistry under C.R.S. § 12-35-113(1)(b).  The Defendants' arguments on this issue focus only on whether they are, as a matter of fact, engaged in the practice of dentistry, and they do not appear to contend that, if they are found to be so, the Court nevertheless should not void the agreement as against public policy.  Even assuming the Defendants raise such an argument, the Court finds that, based on a balancing of interests similar to that described above, Sections 1.4 and 1.5 of the Agreement are void as against public policy.

c.   Maintaining a financial interest in a dental practice

The Plaintiffs also contend that the Agreement improperly gives the Defendants a financial interest in a dental practice in violation of C.R.S. § 12-35-116(1).  That statute states "The conduct of the practice of dentistry . . . in a corporate capacity is prohibited," unless the corporate

---

[9]The Court is somewhat sympathetic to the Defendants' suggestion that the plain language of the statute appears to have a surprisingly broad sweep.  Indeed, it appears from the statutory text that any landlord leasing office space to a dental practice would be engaged in the practice of dentistry, as would, say, an entity leasing computers or X-ray machines to the dentist.  Nevertheless, where the statutory language is clear, this Court must apply it as written.  If the Defendants believe the statute to have too broad a reach, their complaints must be directed to the legislature, not this Court.

entity is a professional service corporation.  The Court finds nothing in the text of the cited statute

that supports, directly or by inference, the assumption that an outside entity's maintaining a

financial interest in a dental practice is contrary to public policy.  Even assuming it is, it is clear

that the portion of the Agreement that purportedly creates such a financial interest is the formula

in Exhibit B to the Agreement, which the Court has already voided as a prohibited fee-splitting

provision.  Accordingly, this argument by the Plaintiff, even if meritorious, warrants no further

relief.

             4.  <u>Remedy</u>

The Defendants argue that, if portions of the Agreement are void as against public policy,

the Court should not nullify the contract as a whole.  The Defendants point out that the

Agreement contemplates that possibility, and expressly provides for severability and possible

amendment of the contract's terms to avoid any conflict.  The Plaintiffs concede that the

Bankruptcy Court has only authorized this suit insofar as the parties seek a declaration as to the

facial validity of the Agreement, and that the Court is not being asked to fashion a remedy at this

time.  Accordingly, the Court declines to do so.  It will simply enter a declaration that certain

portions of the Agreement are void as against Colorado public policy, leaving it to the parties to

determine the appropriate course of conduct to follow as a result.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Plaintiffs' Motion to Reopen the Case **(# 41)** is

**GRANTED**.  The Plaintiffs' Motion for Summary Judgment **(# 42)** is **GRANTED.**  The Court

**DECLARES** that Sections 1.4, 1.5 and the formula contained in Exhibit B of the Agreement are

void as against the public policy of the State of Colorado.  Having resolved the only issue that the

parties are authorized to pursue in this action, the Court directs that the Clerk of the Court again close this case.

Dated this 14th day of September, 2007

BY THE COURT:

Marcia S. Krieger
United States District Judge

24